## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| TRISH LEE McCLOUD, by and through her legal guardian, Candy L. Hall, et.al, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No.: 04-1118** Division: Peoria |
| GOODYEAR DUNLOP TIRES NORTH AMERICA, LTD. and THE GOODYEAR TIRE & RUBBER COMPANY, | ) ) ) ) | |
| Defendants, | ) | |
| ------------------------------ | ) ) | Consolidated with |
| WILLIAM BOOKER, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 04-1159 Division: Peoria |
| GOODYEAR DUNLOP TIRES NORTH AMERICA, LTD. and THE GOODYEAR TIRE & RUBBER COMPANY, | ) ) ) ) | |
| Defendants. | ) | |

# ORDER

Before the Court is Defendant's Motion to Bar Testimony [Doc. 163] and Defendant's Motion to Strike [Doc. 199].  For the following reasons, Defendant's Motion to Bar is DENIED and Defendant's Motion to Strike is GRANTED.

### I.
### BACKGROUND

On May 26, 2002, Plaintiffs Trish McCloud and William

Booker were riding on Booker's motorcycle when the rear tire
(the "subject tire") suffered a blow out.  The crash resulted in
minor injuries to Booker and serious injuries to McCloud.  On
April 4, 2004, McCloud brought this diversity suit against
Goodyear Dunlop and Goodyear Tire & Rubber Co. claiming that the
tire was defective.  On May 18, 2004, Booker filed his own suit
against Defendants, also alleging a manufacturing defect.  Both
suits have now been consolidated.

The subject tire was a bias ply motorcycle tire, called a
Dunlop Qualifier K627B.  A tire is generally composed of
reinforcing layers of material or plies.  The layers of the
subject tire are as follows:  An "innerliner" ply serves as the
functional equivalent of an inner tube, and is the first ply
placed on a tire-building drum.  The innerliner ply does not
have any cords embedded in it.  The next two plies are carcass
plies, which have nylon cords embedded in the rubber.  These
carcass plies help to give the tire strength and shape.  The
edges of the carcass plies and the innerliner ply are wrapped
around beads, which in the finished tire are pressed against a
flange on the vehicle wheel rim so the tire can be inflated.
After the assembly of the innerliner and carcass plies, two belt
plies are added, and then two sidewall plies -- the edges of
which are also turned up around the beads.  The last layer of
the tire is the tread ply.  The tread ply, as one would expect,

is the outer layer of tread which contacts with the road.  These plies together are the primary components of a "green tire." During manufacturing, this green tire is then placed in a mold and vulcanized, or subjected to pressure and heat, to produce the finished tire.

Both sides agree that the failure of the tire occurred because the innerliner of the tire was compromised by the nylon cords.  However, they disagree as to how and when this occurred. Plaintiffs' experts conclude that the cords became embedded in the innerliner during manufacturing, due to a manufacturing defect known as a "tight tire" or "tight carcass".  Essentially, Plaintiffs argue that during the manufacturing process, the cords from the carcass plies became embedded in the tire's innerliner.  Over time, air was able to migrate from the inner chamber through the lays of the tire out to the sidewall.  While the sidewall was able to hold the air, it was not designed to hold air so it eventually burst causing the accident.  On the other hand, Defendant's experts conclude that the tire was run "overdeflected" for a long period of time.  "Overdeflection" of a tire is when a tire is under-inflated and/or overloaded. [1]

---

[1] Defense Counsel is adamant that it is undisputed that the subject tire was run in a severely overdeflected condition. Specifically, Defendant points out that there was a 914 pound load on the tires (including the motorcycle) at the time of the accident.  The maximum weight listed for the tires is 827 pounds.  This fact may be undisputed.  However, Defendant

Defendant believes that overdeflection in this case caused "bending compression" in the cords, which in turn resulted in the cords pulling through the innerliner leading to the blowout.

Plaintiffs plan to call two expert witnesses as part of their case-in-chief -- Gary Derian and William Woehrle. Plaintiffs also plan to call one expert witness, Alan Kasner, as a rebuttal witness.  Defendant is now seeking to bar Plaintiffs experts based upon Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals Co., 509 U.S. 579 (1993).

A hearing was held on this matter on July 11 and 12, 2006 ("Daubert hearing") and upon receipt of the transcripts from that hearing, the parties filed post hearing briefs.  (Def. Brief, Doc. 108; Plaint. Brief, Doc. 209.)  At the hearing, this Court ruled that certain parts of Kasner's testimony were stricken and Kasner cannot testify as to plaintiff's theory of a manufacturing defect.  That is to say, Kasner cannot testify that the subject tire was manufactured as a tight carcass.  The Court stated at the time that such testimony duplicates the testimony by Plaintiff's other experts.  However, the Court allowed Plaintiff to proceed on his testimony that it is

_____

further argues that the facts show that the tire pressure in the subject tire was low over the life of the tire making it severely overdeflected.  There is a lack of clear evidence regarding tire pressure over the life of the tire and at the time of the accident.  As a result, the severity of any overdeflection is squarely in dispute.

physically impossible for the blow-out to be caused in a manner as described by Defendant's expert.

Finally, in their post hearing brief there are several facts emphasized by Defendant to dissuade this Court from allowing the Plaintiffs' experts to testify.  Those facts center on testing performed by Plaintiffs' expert Woerhle.  Woerhle performed tests on a tire ("test tire") that was the same make and model as the subject tire.  The test tire was run for 3,246 miles when fully inflated.[2]  Woerhle then measured the test tire against the subject tire and found that the overall diameter of the subject tire was one inch smaller than the test tire.  Also, the test tire had a contact patch[3] of only three inches wide while the subject tire had worn down further and had a contact patch of 4.5 inches wide.  With these facts in mind, Defendant now seeks to bar Plaintiffs' experts.

## II.
## LEGAL STANDARD

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the principles set forth by the Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.

---

[2] According to Booker, the subject tire in this case had just over 5,000 miles on it.

[3] A contact patch is the portion of a vehicle's tire that is in actual contact with the road surface.

137 (1999).  As such, a district court is required to determine,
as a threshold matter, whether the expert would testify to valid
scientific knowledge, and whether that testimony would assist
the trier of fact with a fact at issue.  Rule 702 "imposes a
special obligation upon a trial judge to 'ensure that any and
all scientific testimony . . . is not only relevant but
reliable.'" Kumho, 526 U.S. at 147 (quoting Daubert, 509 U.S. at
589).  When applying Rule 702, the trial court functions as a
"gatekeeper" whose role is "to keep experts within their proper
scope, lest apparently scientific testimony carry more weight
with the jury than it deserves."  DePaepe v. General Motors
Corp., 141 F.3d 715, 720 (7th Cir. 1998).[4]

     To determine the admissibility of expert testimony pursuant
to Rule 702, the Daubert Court suggested four non-exclusive
factors that can be used to assess the relevancy and reliability
of an expert's testimony.  The factors include:

> (1) whether the theory or technique can be (and has
> been) tested; (2) whether the theory or technique has
> been subjected to peer review and publication; (3) the
> known or potential rate of error and the existence and

---

[4] In presenting the Court with the applicable law, Plaintiff's
counsel states that Courts have unfairly used Daubert to exclude
vast quantities of otherwise admissible evidence.  Specifically,
Plaintiff argues that conservative courts have used Daubert to
create an era of strict scrutiny that is at odds with the
liberal thrust of Federal Rules.  Plaintiff is lucky that this
Court does not agree with Plaintiff's interpretation of the law.
After all, principles of uniform application of the law would
require this Court to follow in their path and apply that
standard of strict scrutiny.

> maintenance of standards controlling the technique's operation; and (4) whether the technique has achieved general acceptance in the relevant scientific or expert community.

Daubert, 509 U.S. at 593-94.  The list of factors "is not considered to be definitive nor exhaustive, but rather flexible to account for the various types of potentially appropriate expert testimony."  Kumho, 526 U.S. at 137.

The issue at hand is whether the testimony of Plaintiffs' three expert witnesses is reliable.  In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions.  See Kumho, 526 U.S. at 153.

### III.
### ANALYSIS

Under a Daubert inquiry, a district court must first analyze whether an expert is qualified in the relevant field and only then does the Court examine the methodology used by the expert.  Kumho, 526 U.S. at 153.  Accordingly, the Court will first discuss Woehrle and Derian, the two experts who are part of Plaintiff's case in chief.  Next, the Court will look at Kasner, Plaintiff's rebuttal witness.  With each expert the Court will first cover their qualifications and only then will the Court look to their methodology.  Lastly, the Court will address Defendant's pending Motion to Strike.

7

## A. Admissibility of Woehrle and Derian

### i.   <u>Qualifications</u>

An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  While "extensive academic and practical expertise" in an area is sufficient to qualify a potential witness as an expert, Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." <u>Walker v. Soo Line R. Co.</u>, 208 F.3d 581, 591 (7th Cir. 2000).  Thus, a court should consider a proposed expert's full range of practical experiences as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.  <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000).

Woehrle and Derian both have extensive experience in tire manufacturing and tire failure analysis.  Woehrle has a B.S. in Physics; has taken twenty courses in tire testing, quality, and management; is the current Chairman of the Highway Tire Committee of Society of Auto Engineers; is the past President of the Tire & Rim Association; and past Chairman of the Tire Engineering Policy Committee for Rubber Manufacturing.  Woehrle also has twenty-five years of experience in tire testing and tire failure analysis at Uniroyal Goodrich Tire Company.

Similarly, Derian has a degree in mechanical engineering,

two patents in tire designs and sixteen years of experience in technical investigation and consultation in vehicle crashes including tire failure.  He also has twelve years of experience at B.F. Goodrich Co., eight of which he worked as a tire engineer.  At B.F. Goodrich, Derian both designed tires and analyzed bias ply tires with various settings of carcass cord length and tightness.  Since 1990 he has consulted with Dunlop Tire Co. to create a tire fitment guide for all passenger cars sold in the U.S.

Defendants argue that because Woehrle and Derian do not have experience with the manufacture of *motorcycle* tires, they are not qualified to render an expert opinion in this case.

First, both of them do have limited experience with motorcycle tires.  Woehrle testified that while at Uniroyal he did familiarize himself with the basic design, construction, and intended uses of motorcycle tires.  Likewise, Derian testified that during his eight years working with tires at B.F. Goodrich, he had extensive experience working with bias ply tires.[5]

More importantly, the problem with Defendant's argument is that the Defendant does not identify any relevant differences between motorcycle and passenger vehicle tires that might render

---

[5] The tire in this case was a bias ply tire which is typically found on motorcycles as opposed to a radial tire which is typically found on passenger vehicles.

9

Woehrle unqualified to give his expert opinions in the instant matter.  To the contrary, there is expert testimony before the Court that the manufacturing defect of a "tight tire" is not limited to motorcycle tires, but "can occur in any tire with an innerliner and first body ply".[6]  [Doc. 163-22 at 71].  Likewise, Woehrle has testified that the signs of overdeflection remain the same in all tires.[7]

Furthermore, at the Daubert hearing, Woehrle testified that there is not any appreciable difference between the way a motorcycle tire is made versus a passenger car tire or truck tire, and that he has consulted on five other motorcycle tire cases.  (Daub. Trans. at 38.)

Case law from other circuits supports admitting Woehrle's testimony despite the relative lack of specific experience in motorcycle tire engineering.  Those Courts have allowed experts in a broader field to testify to matters that are a specific subset of their field, even though the expert did not specialize

---

[6] Derian stated that a "motorcycle tire is bias-ply tire built just like a passenger car or truck or airplane bias-ply tire." (Depo. of Derian, Doc. 163-22, at 66-67.)  Likewise, Defendants' expert witnesses, Tony Mills and Tom Rolls both agree with Derian's testimony.  (Depo. of Mills, Doc. 170-6 at 141-49; Depo. of Rolls, Doc. at 95, 173).

[7] This testimony is offered in Woehrle's supplemental affidavit attached to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Bar Tetimony of Derian, Woehrle and Kasner [Doc. 170-11, pg. 2], the admissibility of which is discussed below.

in the more specific subset.  See Exum v. General Electric, 819
F.2d 1158, 1163-64 (D.C. Cir. 1987) (registered engineer
experienced in industrial safety and product design, but lacking
any specific expertise in kitchen design, qualified to testify
in products liability action against manufacturer of industrial
fryer); Dixon v. Int'l Harvester Co., 754 F.2d 573, 580 (5th
Cir. 1985) (design engineer may provide expert testimony on
safety of crawler tractor in product liability action against
manufacturer despite lack of prior experience approving crawler
tractor designs); Martin v. Fleissner GMBH, 741 F.2d 61, 64 (4th
Cir. 1984) (mechanical engineers were qualified to present
expert testimony in product liability action against
manufacturer of synthetic fiber crimper although they lacked
previous background in either crimpers or the textile industry).

    This Circuit has at times shown particular deference to the
specialization of sciences.  In Dura Automotive Systems of
Indiana, Inc. v. CTS Corp., 285 F.3d 609 (2002) the Court
addressed a claim that a plastics plant had leaked pollutants
into a water supply.  The plaintiff's hydrogeologist who
collected the data to form a map of the flow of underground
water had no expertise in mathematical models of groundwater
flow.  When creating the map, the data needed to be
mathematically "tweaked."  While tweaking such data was typical
for creating these models, the hydrogeologist had no

qualifications to testify regarding whether mathematically "tweaking" the data skewed the model in the plaintiff's favor. The Court noted that "[t]he Daubert test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." Dura Automotive, 285 F.3d at 614.

However, Dura Automotive is distinguishable from this case. In Dura Automotive there was a distinct gap between the data and the expert testimony. The gap existed because the expert lacked knowledge of mathematical models, knowledge and resulting testimony that would have allowed the trier of fact to determine if any "tweaking" of data was skewed to distort that data in the plaintiff's favor.

In the case at bar, while Woehrle and Derian did not specialize in the subset of motorcycle tires, they are clearly experts in tires in general. Defendant has failed to present any evidence of any gap between the tires in general and motorcycle tires specifically.[8]

More applicable to the case at bar is Tuf Racing Products,

_____

[8] In fact, in arguments raised *infra*, Defendant would like the Court to apply United States Department of Transportation's standards for testing passenger car tires to tests performed by Woehrle on motorcycle tires in this case. (Doc. 208 at 10-11; citing 49 C.F.R. 571.109.) If there is a legitimate difference between the two forms of tires, such standards would not apply.

<u>Inc. v. American Suzuki Motor Corp.</u>, 223 F.3d 585 (7th Cir. 2000).  In <u>Tuf</u> the Lower Court allowed an accountant to testify on damages suffered by a motorcycle dealership for wrongful termination of a franchise agreement.  The Defendant argued that the accountant should not have been permitted to testify as an expert because he did not have a degree in economics, statistics, or mathematics.  The Court stated that "the notion that <u>Daubert</u>… requires particular credentials for an expert witness is radically unsound."  <u>Tuf</u>, 223 F.3d at 591 (internal citation omitted).  The Court thus held that "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness."  <u>Id.</u>

   <u>Tuf</u> is more applicable to the case at bar because Defendant is essentially arguing that Plaintiffs' experts lack specific credentials for evaluating Motorcycle tires.  Because there is not a difference between motorcycle tires and tires in general before the Court, Derian and Woerhle have relevant expertise enabling them to offer responsible opinion testimony.  Thus, this Court finds the holding of the other circuits as well as the holding in <u>Tuf</u> more applicable to the case at bar.  As a result, because Derian and Woerhle are thus qualified, the Court will proceed on to evaluating their methodology.

### ii. Methodology

In carrying out its "gatekeeping" functions, this court must also assess the reliability of the methodology employed by the experts in reaching their opinions.  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  <u>Daubert</u>, 509 U.S. at 595. Both Woehrle and Derian state that the carcass ply cords were essentially too tight creating a thin liner that was pushed into the cords.  When the tire was mounted, some of the cords pulled free into the interior of the tire.  This allowed inflation pressure from inside the tire to penetrate the loose plies, creating a bubble in the sidewall that inflated with air and finally burst.  Such a defect, they assert, is readily and immediately visible upon visual inspection at the tire factory, and at that time the tire should have been scrapped.

### 1. Visual and Tactile Inspection

Woehrle and Derian each employ visual and tactile inspection of the failed tire as the primary basis for their conclusion.  For example, Derian observes that the carcass ply cords are surrounded by the wrong kind of rubber (innerliner rubber, instead of carcass ply rubber), and that the rubber is too thin.  Woehrle describes a series of measurements of various parts of the tire, including "bead width" and "bead taper," all of which indicate a "tight tire".  Both state that the only way

the cords could have become embedded in the liner was prior to the tire's transition to a solid state, which could only have occurred during the curing process.

Woehrle and Derian also employ visual and tactile inspection as the primary basis for their conclusion that the tire did not fail due to abuse.  For example, neither of them observed any physical signs of "overdeflection" in the subject tire.[9]  Based on their knowledge of the operation of tires, they further argue that it is physically impossible for the cords to pull through the rubber plies during the operation of the tire. Derian states that when a tire is in operation, "the cords are placed under tension from the inflation pressure and in the area of the footprint the cord tension is reduced not increased." Woehrle states that because of the direction of the stress and strain of cords in a tire, the cords do not compress, nor do they snap.  Finally, they both point out that if by some means the cords did pull through the rubber due to overdeflection, each cord would have left a trail behind, and there are no such trails in the subject tire.

Therefore it appears that Woehrle and Derian each formed their conclusions by comparing the physical evidence before them

---

[9]  Such physical signs of "overdeflection" are: rim flange indentations in the bead regions; bead flange groove on the right side; uneven tread wear pattern; and scuffing on the tire's total circumference.

against the knowledge they have acquired from their experience in tire failure, testing, and manufacture.  Thus, the question is whether this approach of applying their knowledge and experience to data obtained from visual inspection is reliable.

The law suggests that nondestructive visual and tactile examination of a failed tire is accepted in the field of tire forensics.  See Kumho, 526 U.S. 137, 156 (1999) (stating that no one denies that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire).

Likewise, Defense expert John Smith stated that "[i]n most instances, a visual and tactile examination will give a trained and experienced tire examiner with a background in testing, evaluations, and studies, sufficient evidence in order to draw a valid conclusion about why the tire failed." (Report of Smith, p. 3); see also Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 84 (1st Cir. 1998) (stating that the fact that the plaintiffs' expert employed essentially the same technique furnishes added validation).  As a result, the Court feels comfortable relying upon Derian and Woerhle's visual and tactile inspections as their primary methodology.

Defendant also argues that Woerhle and Derian conducted their inspections and reached their expert opinions "too quickly." (Doc. 208 at 8.)  Specifically, Woerhle and Derian

both reached their initial conclusion that the tire was defective in less than three hours.  This position is an example of an argument that goes to the weight rather than the admissibility of an expert's testimony.  From a defendant's perspective, experts, hired by a plaintiff, reach a conclusion which is sought by the plaintiff.  The fact that they reached that conclusion quickly makes it seem more likely that their testimony was geared toward the plaintiff's wishes – in short, it goes to credibility.  However, from a plaintiff's perspective, experts can reach their conclusion quickly because they have considerable experienced and because the evidence is so clear that that no additional time is needed.  Without additional facts, when an expert reaches their conclusion quickly, it only goes to the expert's credibility with the proper spin and alone does not undermine the expert's reliability.  After all, we expect the jury to evaluate conflicting experts over a limited period of time.  Even without any prior experience or knowledge on the subject, if they reach a conclusion in a few hours, their findings are still given the full faith and credit of the law.

Accordingly, visual and tactile inspections, even if performed quickly, still meet the professional standard for tire investigations in this case.  While this alone would be sufficient for Woerhle and Derian to testify, this Court will

still take the time to analyze Woerhle's tests.[10]

## 2.   Absence of Specified Testing

Whether an expert's theory can be and has been tested is the first Daubert factor.  However, "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho, 526 U.S. at 153 (emphasis in original).  Furthermore, "[w]hile observation without laboratory testing may not satisfy the reliability requirements for scientific testimony, more flexibility is required when determining the reliability of experience-based methodology." Chapman v. Maytag, 297 F.3d 682, 688 (7th Cir. 2002). There are two arguments that the Defendants make concerning Woerhle's tests in this case: (a) The measurements of the test tire were not reliable; and, (b) the test tire was not overdeflected.

### a. Measurements

Defendant argues that the measurements made by Woerhle are unreliable.  Woerhle's test tire which presumably did not contain any defects underwent 3,246 miles when fully inflated and was then compared to the subject tire.  Specifically, Woerhle found that when the test tire was deflated it was one inch larger in diameter than the subject tire.  According to Woerhle, this was a sign that the subject tire was not properly

---

[10] Woerhle's tests were relied upon in this case by Derian.

produced – it was a "tight tire."  Defendant argues that this
test is unreliable because it is not comparing "apples to
apples."  When comparing measurements of tires, the best way to
compare the sizes of the tires is to mount both tires and
inflate them to a specific pressure, allow them to sit for 24
hours, check the air pressure again, and then compare
measurements.  Given that tires can change shape depending upon
the way they are stored, inflating the tires gives the most
accurate measurements.  As a result, the United State's
Department of Transportation specifies the above procedures when
measuring the dimensions of tires. 49 C.F.R. 571.109

       However, in the case at bar, the subject tire has a hole in
it.  To expect Woerhle to inflate a tire with a whole in it is
to expect the impossible.  To meet the testing factor required
by Daubert an expert does not need to perform the best
conceivable test. Instead, the question is whether valid
scientific testing was performed.  Daubert, 509 U.S. at 593-594.
In this case, inflating the subject and test tires first would
have been ideal, but since that was not an option, comparing the
two deflated tires is still a valid scientific test which would
aid the jury in reaching their conclusion.

       Defendant describes the federal standards for measuring a
tire.  However, these standards are for determining the exact
measurements of a tire.  The regulation sets the standard for

"tire dimensions and laboratory test requirements for bead
unseating resistance, strength, endurance and high speed
performance; defines tire load ratings; and specifies labeling
requirements for passenger car tires."  49 C.F.R. 571.109(S1).
The requirements specify that the physical dimensions not exceed
the dimensions submitted by the manufacturer for publication. 49
C.F.R. 571.109(S4.2.2.2).  These measurements are thus for
determining the accuracy of the exact measurements of a tire
which will be available to the public.  These numbers can not
have any degree of error or the public, including rim
manufacturers, could receive faulty information.  As a result,
one would expect such measurements to be under the most exacting
conditions which would produce the most precise results.  The
standard for admissibility is lower in a forensic tire
investigation.  Expert testimony can tolerate a small or
minimized margin of error.  U.S. v. Havvard, 260 F.3d 597 (7th
Cir. 2001)(allowing fingerprint evidence to be used despite
concessions that there is a very small margin of error due to
differences among individual examiners).  At this stage, this
Court need only determine if the testimony is based upon
reliable principles and methods.  Fed. R. Evid. 702(2).  Nothing
in the standards submitted shows the Court that a failure to
follow the standards will produce misleading or unreliable data,
only that the measurements will lack the precision down to the

millimeter that would be expected for publishing a tire's
standard dimensions.  Woerhle stated when questioned on this
subject in the Daubert hearing that such measurements are still
accurate, even though they are not as accurate as the
measurements taken following the standards set by the
government.  (Daub. Trans. at 177-182.)  Defendant has not
presented any literature or evidence to the contrary.  Woerhle's
failure to follow those standards because the subject tire has a
hole in it does not mean that the measurements are not accurate
enough to submit to a jury.

### b. Overdeflection of the Test Tire

In addition, there were also other comparisons made between
the test tire and the subject tire.  For instance, the test tire
had a contact patch of only three inches wide while the subject
tire had worn down further and had a contact patch of 4.5 inches
wide.  According to Plantiff's experts this was a sign of a
faulty product.  On the other hand, the Defendant's experts
contend that this is a sign of an overdeflected tire.  Defense
counsel now argues that this measurement is unreliable because
the test tire was not overdeflected.

Defendant seems to argue that the only reliable test would
have been to overload and under inflate a tire while it is being
tested.  However, this Court notes that even this would not be a
perfect test.  The only perfect comparison would be to put the

test tire through all the same stresses which were placed upon the subject tire.  This includes putting the test tire through all the precise overloading and under inflating, accelerating, decelerating and turning which was faced by the subject tire on the same surfaces which were faced by the subject tire.[11]  The problem is that the exact conditions faced by the subject tire are not clearly before the Court nor were they clearly before the experts.  Defendant would like the Court to conclude that the tire was under inflated because Booker testified that he never inflated the tires himself and instead only had the tires filled when he went in for a tune-up.  Furthermore, Plaintiff would like the Court to ignore Booker's visual inspections as unreliable and inaccurate.  (Daub. Trans. at 193-196.)  However, according to Woerhle, there were relatively even treadwear patterns on the tire and there was "a virtual absence of rim flange indentations in the bead regions." (Doc. 170 at 2.)  As a result, Woerhle concluded that the tire had not been run under inflated and overloaded and ran his test accordingly.  Thus, this Court concludes that while it is not disputed that at the time of the accident the motorcycle was overloaded, the severity of the overloading and under inflating which occurred over the

_____

[11] In addition, a perfect test would also need to account for any "distortion" which affected the shape of the subject tire during the accident and from moving the motorcycle with a flat tire after the accident.

life of the tire is within dispute.

When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. In such a case, the language in Rule 702 "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003). Likewise, it is not the province of the Court, when addressing motions under Rule 702, to choose one set of facts over another when the facts are clearly in dispute. Id. In this case, since neither side can definitively prove at this stage the severity of overdeflection, the Court can not conclude that a test run on a fully inflated tire is unreliable unless this Court inappropriately adopts Defendant's version of the disputed facts. If a jury agrees with Defendant's version of the facts then Woerhle's test might not have any credibility. However, the Court will not invade the province of the jury and finds at this stage that Woehrle's test is reliable to be testified to by Woehrle and the other experts.

### 3.  Use of Literature

Defendant argues that Plaintiffs' experts "misused" literature. Defendant states that there is only one article that exists on the cord tension in tires and argues that the

expert testimony conflicts with that article.[12]  Ralph Patterson,
The Measurement of Cord Tensions in Tires, 42 Rubber Chem. and
Tech, June-August, 1969 at 812.  However, in so doing, Defendant
mischaracterizes the expert testimony to create a conflict.

According to the Defendant, Plaintiffs' experts disagree
with the findings that severe overloading or under inflation
will cause the cords to compress.  Here it is necessary to
differentiate between the forms of compression which were
discussed.  Compression overall is when there is pressure to
compress the length of the cords.  Bending compression is when
the inside bend of the cord is compressed while the outside is
still under tension.  Woerhle stated in his deposition that if
the article was suggesting that when a tire is overdeflected the
cords compressed overall then he disagreed with the article's
conclusions. (Woerhle Dep. at 258-268.)  However, Woerhle
acknowledged at the time and later that overdeflection can cause
bending compression.  (Id. at 256; Doc. 170 Ex. 11 at 3).  Based
on the evidence before the Court, Defendant's experts used

---

[12]  The Court notes that in the limited portions of expert
depositions which were made available to the Court, Plaintiffs'
experts discuss several publications and articles which relate
to their testimony.  (Woerhle Dep. at 250-270.)  The Court is
somewhat confused as to why Plaintiffs' counsel never brought
these publications to the Court's attention in their briefs.
(see Doc. 170 at 17-18; Doc. 10.) It is particularly important
since publication of an expert's theory is one of the factors
for admissibility under Daubert.  Judges are not expected to be
pigs hunting for truffles buried in the record. United States v.
Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

different terminology but agree with Woerhle's understanding of
bending compression.  In fact, their explanation for the
accident is that bending compression from overdeflection damaged
the tire.  As a result, since it appears that the parties no
longer disagree over the relevant form of compression in this
case, any disagreement which Woerhle may have had with the
article is irrelevant to the case.

This is the only conflict raised by the Defendant between
Plaintiffs' experts and relevant publications.  Other
publications were used in developing the expert theories in this
case. (Doc. 170, Ex 1 at 7.)  Accordingly, there is no basis to
conclude that the expert testimony in any way conflicted with
those or other publications in this case.

### 4.  Defendant's Remaining Challenge

Defendant does not raise any challenges that Woerhle or
Derian failed to meet the third and forth prongs of the <u>Daubert</u>
test.  Specifically, Defendant never argued that there was a
high rate of error in theories or techniques employed by the
experts.  Likewise, Defendant never argued that the techniques
employed have not achieved general acceptance in the expert
community.  Accordingly, the Court will not address these two
prongs of the expert's methodology.  Nevertheless, Defendant
does raise a miscellaneous argument which must be addressed.

Defendant argues that Derian and Woehrle "ignore or merely

dismiss the available statistical data". The "statistical data" they are referring to is an adjustment data report that shows that only one tire out of the 1,234 K627B tires that were made by Dunlop in that production run was returned. According to the Defendant, if one tire had the defect alleged, because of the automated process of tire production, then all of the tires in the production run must have had the same defect. Since only one of the 1,234 other tires has been returned, it is impossible that all of those tires had this defect. This argument is typically found in a product liability action where a Defendant is seeking some form of directed verdict. See, e.g., Escola v. Coca Cola Bottling Co. of Fresno, 150 P.2d 436 (Ca.Sup.Ct. 1944). Nevertheless, this Court will address this argument at this time.

According to Derian, it is possible that only one "test tire" was made which was supposed to be destroyed. A defective "test tire" would not be reflected in the entire run of tire production. It easily could have slipped through the inspection process and made its way onto Booker's motorcycle. Since Defendant's data does not include how many tires were scrapped or how many should have been scrapped, there is a reasonable possibility that a defective test tire made it through production. As a result, Plaintiff's argument is not dispositive of the case at this stage. It is a question for the

jury to decide what weight to give this particular piece of evidence.  Id.  Furthermore, the fact that such data exists does not discredit the reliability of Derian and Woehrle's methodology.

### C. Admissibility of Kasner

Plaintiffs intend to call Alan Kasner as a rebuttal witness.  At the hearing, this Court already ruled that certain parts of Kasner's testimony were stricken.  Specifically, Kasner cannot testify as to Plaintiffs' theory of a manufacturing defect.  The Court stated at the time that such testimony duplicates the testimony by Plaintiff's other experts.  However, the Court allowed Kasner to proceed on his testimony that it is physically impossible for the blow-out to be caused in a manner as described by Defendant's expert.[13]

In terms of qualifications, Alan Kasner, Ph.D. has 15 years of experience in testing and analysis of polymers, including rubber products.  For the past 10 years he has worked in the polymers industry in product development and troubleshooting. He is currently an instructor of a Plastics Testing and Failure Analysis Seminar that is co-sponsored by the Society of Plastics Engineers and is a member of the American Chemical Society's

---

[13] It should be noted that at the Daubert hearing this Court strictly held to its ruling limiting Kasner's testimony to rebutting Plaintiffs' experts.  Going forward, the Court expects the parties and the witness to continue to abide by that ruling.

Rubber Division.  Kasner's Ph.D. is in the field of Polymer
Science and he has a B.S. in Chemistry.  He teaches the section
of Failure Analysis and Prevention Workshop Seminars which are
co-sponsored by the Society of Plastics Engineers and Bodycote
Polymer-Broutman Laboratory.  Part of Kasner's experience
includes consulting for ATK Thiokol Propulsion from 1996 to 2000
where he worked on developing sufficient kevlar fiber filled
rubber insulation for the interiors of rocket boosters used with
Delta, Titan and Pegasus rocket motors to protect the boosters
during fuel burns.  (Doc. 170, Ex 11)

It is clear that Kasner's qualifications are related to the
field of rubber and not to the field of tires.  If Kasner was
part of Plaintiffs' case in chief, Plaintiffs would have a
problem.  Kasner is not qualified to discuss tire manufacturing
or tire design.  However, with regard to the limited field of
plastic and rubber polymer's his qualifications fit the bill.

Defendant's experts have put forward a theory that the ply
cords pushed through the rubber during operation of the
motorcycle.  This pushing was the result of overdeflection and
not a result of a faulty product.  To combat this theory,
Plaintiffs have called Kasner.  The thrust of Kasner's testimony
is that the cords which pushed through the innerliner of the
subject tire did not leave a trail or tear in the innerliner,
therefore the cords must have become imbedded in the innerliner

28

during production rather than after production.  Kasner
explained how unvulcanized rubber is actually a high viscosity
fluid.  The cords, which are a solid, can move through the
rubber during production without leaving a trail because the
rubber has yet to be vulcanized.  However, during production the
rubber is vulcanized which turns the rubber from a liquid into a
solid.  Once the rubber is in its solid form, the cords can not
push through the solid rubber without leaving a trail.  In this
case, Kasner did not observe a trail in the rubber and presents
evidence that the innerliner did not have a tear or trail from
the rubber.  According to Kasner, the cords must have become
imbedded in the innerliner before the rubber was vulcanized or
while it was still under the control of the Defendant.  (Daub.
Trans 376-390.)

Defendant counter-argues that when a tire is severely
overdeflected, it produces heat that leads to the reversion of
the tire components.  Specifically, when a tire is run severely
overdeflected the rubber can cause the vulcanization to break
down.  (Doc. 208 at 15.)  While Defendant does not complete the
argument, presumably if the vulcanization broke down then there
would not be the tears or trails from cords pulling into the
innerliner that one would expect based upon Kasner's testimony.
According to Defendant, since Kasner is not a tire expert, he
can not rebut this explanation for a lack of a trail or a tear

in the innerliner.

Defendant's explanation could prove convincing.  Defendant could call their experts in response to testify that the vulcanized rubber broke down from heat and as a result there was not a trail or tear in the innerliner.  However, this is not grounds for barring Kasner's testimony.  In fact, when given the opportunity to cross examine Kasner on the subject at the Daubert hearing, defense counsel did not cross examine Kasner on whether the vulcanization could have broken down or whether the rubber could have been re-liquefied such that there would not be a trail or tear in the rubber.  Also, defense counsel never questioned Kasner's level of knowledge regarding vulcanization break down.  Based upon Kasner's expertise as a plastic and rubber expert, this Court can safely assume that Kasner is well qualified to testify on the subject of vulcanization breakdown.  While Defendant's counter argument could be convincing, this Court will not deny Plaintiff's rubber expert from testifying based upon a counter-argument that could be raised at trial.

### D. Defendant's Motion to Strike

Defendant has brought a Renewed Motion to Strike the Second Expert Report of Stan Smith - Plaintiff's expert on the issue of hedonic damages.  Plaintiff does not oppose the merits of the Motion since Plaintiff is no longer pursuing hedonic damages.  Accordingly, Defendant's Motion is GRANTED.

## III.
## CONCLUSION

The primary question which this Court has been faced with is the level of specificity needed in an expert's qualifications.  In certain fields, such as medicine, an expert's specialization in the more specific field is certainly necessary.  See, e.g., Pipitone v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002).  However, in the case at bar, given the expert's sound methodology and solid credentials in the area of rubber polymers and tire mechanics in general, this Court is declining to exercise its discretion under Daubert, 509 U.S. 579, and is allowing the testimony to go forward regarding the motorcycle tire in this case.

IT IS THEREFORE ORDERED that Defendant's Motion to Bar [Doc. 163] is DENIED and Defendant's Motion to Strike [Doc. 199] is GRANTED.


ENTERED this  5th  day of March, 2007.


                              s/ Joe Billy McDade_____
                          Joe Billy McDade
                      United States District Judge