E-FILED
Monday, 02 June, 2008  03:40:31 PM
Clerk, U.S. District Court, ILCD

# 1UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| TRISH LEE McCLOUD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-cv-1118 |
| | ) | |
| v. | ) | |
| | ) | |
| GOODYEAR DUNLOP TIRES | ) | |
| NORTH AMERICA, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N   A N D   O R D E R

Before the Court is Defendant's Renewed Motion for Judgment as a Matter of Law [Doc. 390] and accompanying updated Memorandum [Doc. 412]. This Court allowed for additional briefing after the parties received the official Court transcript. Under the Motion, Defendant seeks a Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(b), or alternatively a New Trial under Federal Rule of Civil Procedure 59 or a Remittitur of damages. Plaintiff has filed a revised Response [Doc. 415] to Defendant's Motion. For the following reasons, Defendant's Motion is DENIED.

## I.
## BACKGROUND

This case arises out of a motorcycle accident that occurred on Interstate 55 in Livingston County, Illinois. Plaintiff, Trish McCloud was riding on the back of a motorcycle driven by William Booker ("Booker"). Together they were returning to

Baldwin, Michigan from a "blessing of the bikes" event in East Saint Louis, Illinois. (Doc. 224 at 8.)

The motorcycle they were riding on was a 1985 Honda Goldwing with tires that were manufactured by Defendant, Goodyear Dunlop Tires of North America, Ltd. ("Dunlop"). While traveling Northbound on Interstate 55, the rear tire of the motorcycle suffered a blow-out and the couple crashed. As a result of the accident, Plaintiff was permanently and severely disabled. Plaintiff then brought this product liability action against Defendant.

Prior to trial, this Court made several rulings that Defendant re-raises in their current motion. First, this Court denied Plaintiff's Daubert motion and held that Plaintiff's expert witnesses were qualified to testify regarding the defectively manufactured rear tire. (Doc. 210, March 5, 2007.) Next, this Court denied Defendant's choice of law motion and ruled that Illinois rather than Michigan law applied to this case. (Doc. 276, July 30, 2007.) Finally, during trial it came to light that Defendant had provided a blatantly misleading response to one of Plaintiff's interrogatory questions during discovery. Specifically, Defendant stated in an interrogatory answer that there was no way to discern who inspected the subject tire. In reality, there was a stamping system in which each tire inspector placed an ink stamp on the subject tire. This number corresponded with the identity of the tire inspector and could be used to trace who inspected the subject tire. Defendant's deceptive answer effectively stopped Plaintiff from conducting a search for the actual individual who inspected the subject tire. Because of this misleading answer

during discovery, this Court sanctioned Defendant with a modified missing witness instruction based upon Illinois Pattern Civil Jury Instruction 5.01.  This instruction allowed Defendant to explain their misleading interrogatory answer but also allowed Plaintiff to argue to the jury that they had effectively been denied access to a witness that could have provided damaging testimony.  (Doc. 373, August 23, 2007.)  This Court issued written orders explaining each of these rulings and Defendant has now re-raised each of these issues in their current motion

At trial, there were two main countervailing themes addressed by the parties. Defendant's primary focus was on the misuse of the tire and argues that the subject tire was "overdeflected" - a term meaning that the tire was overloaded and under-deflated.  To support this position, Defendant presented evidence that Booker's Honda Goldwing had numerous accessories on it that caused the motorcycle to be over the recommended weight.  In addition, there was conflicting evidence concerning how often the tire pressure was checked on the subject tire.

Plaintiff challenged this theory on several levels but particularly emphasized that the front tire on the motorcycle did not show any of the signs of overdeflection. (Tr. Vol. IV at 613.)  The premise: if the cause of the accident was overdeflection then both tires would show signs that they had been misused in a similar manner.

Plaintiff's main theme for her case focused on the manufacturing of the tire. A tire is generally composed of reinforcing layers of material or plies.  In this case, the layers of the subject tire are as follows:  An "innerliner" ply serves as the functional equivalent of an inner tube, and is the first ply placed on a tire-building

drum.  The innerliner ply should not have any cords embedded in it.  The next two plies are carcass plies, which have nylon cords embedded in the rubber.  These carcass plies help to give the tire strength and shape.  The edges of the carcass plies and the innerliner ply are wrapped around beads, which in the finished tire are pressed against a flange on the vehicle wheel rim so the tire can be inflated.  After the assembly of the innerliner and carcass plies, two belt plies are added, and then two sidewall plies -- the edges of which are also turned up around the beads.  The last layer of the tire is the tread ply.  The tread ply, as one would expect, is the outer layer of tread which contacts with the road.  These plies together are the primary components of a "green tire." During manufacturing, this green tire is then placed in a mold and vulcanized, or subjected to pressure and heat, to produce the finished tire.

Plaintiff primary liability expert, William Woehrle, conclude that the cords became embedded in the innerliner during manufacturing due to a manufacturing defect known as a "tight tire" or "tight carcass".  Essentially, Woerhle concluded that during the manufacturing process, the cords from the carcass plies became embedded in the tire's innerliner.  Over time, air was able to migrate from the inner chamber through the layers of the tire out to the sidewall.  While the sidewall was able to hold the air for a time, it was not designed to hold air.  A bubble formed in this rubber layer and which eventually burst causing the accident. (Tr. Vol. IV at 510-540.)

Defendant's challenged this theory with their own experts that not only talked about overdeflection, but also talked extensively about the tire's manufacturing process. They emphasized that because of the mechanized process, if one tire had such a defect then numerous other tires would have had a similar defect. They emphasized that they had not been contacted by customers who had any similar problems with any other tires that had been distributed around that time. Therefore, they argued, such a defect was highly unlikely. Instead, Defendant's experts pointed to the subject tire and opined that a forensic analysis revealed that due to overdeflection, the cord plies had become imbedded in the innerliner causing the leak and the ultimate blow out.

Plaintiff challenged Defendant's theory that the accident was caused by overdeflection with rebuttal expert testimony. Plaintiff called a rebuttal expert, Alan Kasner, who specialized in the chemical reactions that create rubber and polymers. The expert testified that once rubber is vulcanized, it is in a permanent solid state. Therefore, if the cords became imbedded in the innerliner after manufacturing by overdeflection, there would be tears or trails in the subject tire from the cords pushing into the inner liner. These trails or tears, according to Kasner, did not exist on the subject tire. As a result, Plaintiff argued that Defendant's theory that the damage was the result of post-manufacturing overdeflection was impossible.

After three weeks of testimony and two days of deliberation, the jury sent out several questions concerning the second page of the jury form. On the second page

of the jury form, the jury was asked to assign a percentage of fault to either Defendant or Booker.  Despite agreeing to this form, neither party fully explained this page of the verdict form during their closing arguments.  The jury first asked for instructions explaining this section, then asked whether this section needed to be completed, and finally asked what the legal consequences were to Booker for assigning him a percentage of fault.  In connection with each inquiry from the jury, the Court met with the parties and counsel, sought their recommendation, and approval of the Court's response.  After the first question, this Court instructed the jury that they have all of their instructions and should decide the case based upon the evidence and the instructions already given.  After the second question, the Court told the jury that this portion of the instruction needed to be completed.  And finally, after the third question, the Court told the jury to determine the facts and apply the law given by the Court.  Specifically, the Court stated that "[t]he consequences, if any, to Mr. Booker, is a question of law for the Court to decide and is not your concern."

After this instruction was given, the jury then returned the following verdict: Plaintiff was awarded $1,500,000.00 for disfigurement and scarring; $4,869,141.50 for mental, physical and emotional pain and suffering in the past and reasonably likely in the future;  $4,869,141.50 for loss of a normal life and experienced in the past and reasonably likely in the future; $472,794.14 for the reasonable value of necessary medical care, treatment, services and life care needs spent so far; and $3,288,923.00 for the reasonable value of necessary medical care, treatment,

services and life care needs that would reasonably be required.  In total Plaintiff's award was $15,000,000.

On the page which apportioned fault between Booker and Goodyear, jury decided that Booker was five percent at fault for the injuries suffered and Defendant was ninety-five percent at fault for the damages.

## II.
## ANALYSIS

Defendants have now filed a Motion asking for judgment as a matter of law, a new trial, or, in the alternative a remittiture.  Rather than focus and fully develop a few convincing issues, Defendants have chosen instead to reraise every major issues previously addressed by the Court and shot-gunned a plethora of new issues to support their request for relief.  See Gagan v. American Cablevision, Inc., 77 F.3d 951, 955 (7th Cir. 1996) (noting that an appellant is much better off fully fleshing out a single issue than adopting the "shotgun approach" in the hope that one of many poor arguments will prevail.)  This Court will not rehash Defendant's old arguments.  Neither a motion for a judgment as a matter of law nor a motion for a new trial can be used as a vehicle to relitigate old matters. Moro v. Shell Oil Co., 91 F.3d 872, 876 (7th Cir.1996).  Specifically, this Court will not reconsider arguments that were already addressed regarding Defendant's Daubert motion, Defendant's choice of law motion, and the discovery sanction.

## A.
## Request for Judgment as a Matter of Law

Plaintiff argues that he is entitled to a judgment as a matter of law because Plaintiff failed to prove that a defect existed in the subject tire at the time the subject tire left Defendant's control.

Judgment as a matter of law is appropriate only "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." Fed.R.Civ.P. 50. When considering a Rule 50 motion, a court must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in that party's favor. Zimmerman v. Chicago Bd. of Trade, 360 F.3d 612, 623 (7th Cir.2004). A court should disregard any evidence that was favorable to the moving party that the jury was not required to believe, but it must give credence to evidence that was uncontradicted and comes from disinterested witnesses. Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150-51 (2000). The verdict should be overturned only if no reasonable jury could have found in the non-moving party's favor. Erickson v. Wis. Dep't of Corrs., 469 F.3d 600, 601 (7th Cir.2006).

In the case at bar, Defendant argues that Plaintiff's experts were not able to explain where in the manufacturing process, the defect was created. Such a specific explanation is not needed for Plaintiff to have a viable claim. In Welge v. Planters Lifesavers Co., 17 F.3d 209 (7th Cir. 1994), our Appellate Court addressed a product liability claim under Illinois' strict liability law. The Court held that the plaintiff only needed to demonstrate that the product was in a defective condition when it left the defendant's control. The plaintiff in Welge did not need to detail where in

the manufacturing process the defect was created, since evidence that the product was defective when it left the defendant's control is sufficient to establish liability. Id. at 211.

In this case, Woehrle opined that the forensic evidence from the subject tire showed that the defect occurred during the manufacturing process.  He then put forward three possible ways that such a defect could have been created during the manufacturing process (improper bead set, improper cord angle or a thin guage liner).  These three possible causes were not simply speculative guesses for how the cords could have pulled through the liner.  Indeed, Defendant's expert and corporate representative agreed that with Woehrle about the possible causes of a "cord through liner" defect.  Defendant now comes down on Woehrle and specifically argues that Woehrle did not have any evidence that would allow him to narrow down which of these three possibilities caused the relevant defect.  It is unclear what evidence Defendant expects from Woehrle.  In Defendant's brief they call for "personal knowledge of Defendant's manufacturing process:"  a video tape of a worker improperly setting the bead for the subject tire, or a signed confession from a plant manager detailing the bad cord angle might be sufficient under Defendant's standard.  However, such evidence is not needed under Illinois law for Plaintiff to make her case.

By narrowing down the source of the accident to one of three possible manufacturing errors, Plaintiff established that the product was manufactured in a faulty manner while under Defendant's control.  A plaintiff does not need to narrow

down which specific error a defendant made during the manufacturing process as long as the evidence establishes that the error was made during the manufacturing process. See McKenzie v. S K Hand Tool Corp., 650 N.E.2d 612, 617 (Ill. App. Ct. 1995) (noting that although the plaintiff's expert was not able to replicate the faulty manufacturing or isolate the precise cause of the faulty manufacturing, absence of such proof is not fatal to plaintiff's case.)

Defendant also argues that Plaintiff never rebutted the evidence that a tire with a "cord through liner" could not have survived the manufacturing process. According to Defendant a tire with this kind of defect would have exploded during the automated portion of the manufacturing process and in the post cure inflation machine. However, Defendant's argument misstates the evidence. One of Defendant's corporate representatives, Thomas Rolls, was specifically asked about this issue and stated that in his experience he had seen three tires with this defect. Two of them exploded during the manufacturing process and one was caught in the later inspection. [Tr. Vol. VIII at 1405.] According to Defendant's own representative, it is possible for this defect to survive the manufacturing process. Accordingly, Defendant is not entitled to judgment as a matter of law

### B.
### Request for a New Trial

A federal court sitting in diversity applies federal standards to a motion for a new trial. McClain v. Owens-Corning Fiberglas Corp., 139 F.3d 1124, 1126 (7th Cir.1998). A district court may grant a new trial if it finds the verdict is against the manifest weight of the evidence or if prejudicial error occurred. Id.; Bankcard Am.,

Inc. v. Universal Bancard Sys., 203 F.3d 477, 480 (7th Cir.2000).  To meet this standard, Defendant must demonstrate that no rational jury could have given the rendered verdict.  King v. Harrington, 447 F.3d 531, 534 (7th Cir.2006) (citing Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917, 926 (7th Cir.2004)).  A court will sustain the verdict where a "reasonable basis" exists in the record to support the verdict.  Id.  Further, a motion for a new trial is based on an error of law, the moving party must show that the error was substantial enough to deny it a fair trial.  Perry v. Larson, 794 F.2d 279, 285 (7th Cir.1986).

Defendant puts forward nine arguments to support the request for a new trial: (1) The discovery sanction was unwarranted; (2) The request for the discovery sanction was untimely; (3) The discovery sanction allowed Plaintiff to make improper putative arguments during closing statements; (4) Woehrle's improper testimony prejudiced Defendant; (5) Kasner's improper testimony prejudiced Defendant; (6) Plaintiff's "day-in-the-life" video improperly prejudiced Defendant; (7) Plaintiff's counsel's improper questioning of Thomas Rolls improperly influenced the deliberative process; (8) the verdict was against the manifest weight of the evidence; and (9) Michigan law should have applied.  None of these arguments, alone or collectively, convince this Court that a new trial is necessary.

### 1. *The discovery sanction was warranted*

Defendant argues that the discovery sanction was unwarranted because their misleading interrogatory answer was not "deliberate."  Specifically, Defendant was asked to state the names of all the tire inspectors.  Defendant responded by stating

that "[a]t the time of the manufacture of the subject tire, inspectors at [Dunlop] were responsible for the inspection of all motorcycle, passenger and light truck tires. Therefore, *there is no way to isolate who inspected the subject tire or any tires from the subject tire line*." (Doc. 364, Ex F. at 5, emphasis added.)  The problem, as this Court has already noted, is that each tire inspector stamped each tire with his own number.  As a result, if the number could be discerned, there was a clear method in place for determining the identity of the subject tire's inspector.  By misleading Plaintiff, Defendant denied Plaintiff an opportunity to forensically analyze the tire to determine the number on the tire and identify the tire inspector.

Defendant now argues that they were not aware of the individual tire inspector's identity, because the inspector's stamp was illegible, therefore they could not have been trying to deliberately hide an unfavorable witness.  Whether Defendant was deliberately attempting to hide the identity of a known witness or engaging in a general policy of misleading and stonewalling Plaintiff to prevent him from discovering any unknown witness, does not matter.  Defendant's conduct was still a deliberate attempt to deceive Plaintiff and prevent Plaintiff from identifying a relevant source of evidence.

Defendant also tries to argue that they disclosed the tire inspection stamp system in their produced documents.  Buried within Defendant's disclosed documents is a reference that every inspector must place a stamp with his number on each tire.  However, this document does not state that the number is placed on the tire in ink and that the number could later be used to discern the identity of

each tire inspector.  As a result, it does not mitigate Defendant's previous deceptive answer.  This Court noted that plaintiffs are not required to test and challenge the validity of every answer they receive to an interrogatory.  In the case at bar, once Defendant stated that there was no way to determine the identity of the tire inspector, Plaintiff had a right to take that assertion as true.  Once it came to light at trial that Defendant's answer was deceptively misleading, and that Defendant had never taken an opportunity, pre-trial, to correct their deception, this Court imposed the appropriate sanction.

2.  *The discovery sanction was timely*

Defendant argues that the timing of Plaintiff's motion for sanctions reveals an insidious intent on the part of Plaintiff.  During trial, the video deposition of one of Defendant's corporate representatives, Hugh Thompson, was presented to the jury.  Defendant points out that within the designations put forward by Plaintiff was Thompson's verification of Defendant's discovery responses.  Defendant argues that Plaintiff was aware of tire inspection process the entire time and was aware that Defendant had provided a misleading answer in their interrogatories.  They then designated this portion of Thompson's deposition for presentation to the jury in an attempt to set up Thompson for impeachment.

This Court does not see the conspiracy alleged by Defendant.  This Court questioned Plaintiff's counsel about his knowledge of the stamp system and he affirmed to the Court that he was unaware that the stamp system existed prior to trial.  Furthermore, this Court inquired into Plaintiff's counsel's previous

experience litigating tire cases.  Plaintiff's counsel affirmed to the Court that at no time in any other case that he had litigated was he ever made aware that Defendant's tire inspectors stamp their personal identification numbers on to tires. Defendant has had ample time since trial to investigate this affirmation and Defendant has not brought any post-trial evidence to the Court's attention which would dispute counsel's affirmation.  Finally, this Court has no reason to doubt counsel's statement since it was not Plaintiff's counsel that provided the deliberately misleading discovery response.  Accordingly, this Court will not read an insidious intent into the timing of Plaintiff's motion.

     3. *Closing Arguments*

Defendant argues that because of the discovery sanction, Plaintiff was able to improperly introduce a putative element into the case during closing arguments. During closing arguments, Plaintiff's counsel stated that "the truth of the matter is that the only sabotage at issue in this case is Goodyear Dunlop's deliberate attempt to prevent us from discovering the identity of the inspector of this tire."  Defendant objected and this Court provided a curative instruction.  Specifically, the Court informed the jury that "statements by counsel during oral argument are not evidence, and anything counsel says which is not based on evidence, should be disregarded by the jury because you must use your own recollection of the evidence."  (Tr. Vol. XII at 2275, Doc. 408 at 67-68.)

During rebuttal, Plaintiff's counsel went on to make the following statements:

But you know folks, something really does stink here and it isn't our evidence.  It's a company that is recalcitrant, a company that is unrepentant, and a company that will do and say virtually anything to avoid taking responsibility for what happened to this woman....

Because you know what, ladies and gentlemen, there is a pattern of conduct here. There is a pattern of making promises that they don't keep. Witnesses that they don't call. False statements in interrogatory answers to keep us form learning the identity of critical witnesses....

This is a case about facts and it's a case about social responsibility and social conscience....

Sometime juries have to sit in the unenviable [position] of being the conscience of a recalcitrant, unrepentant corporation like Goodyear Dunlop. And today, ladies and gentlemen, that responsibility catches up to Goodyear Dunlop....

Defendant now argues that these statements improperly appealed to the conscience of the community.  However, this argument is waived because Defendant failed to object to these statements when they were made on rebuttal.  "Any potentially improper statements should [be] called to the attention of the trial judge, in order that she might be given a timely opportunity to correct any prejudice that might result from such remarks." Doe v. Johnson, 52 F.3d 1448, 1465 (7th Cir. 1995).  When a party fails to object to during closing arguments in a civil case, the issue is waived.  Id.  Accordingly, there is no legal reason for this Court to conclude that counsel's statements during rebuttal should be considered as a basis for a new trial.

Furthermore, while counsel comments were overzealous, even if Defendant had lodged an objection, the comments did not meet the standard for requiring a new trial.  Our Appellate Court has "repeatedly explained that 'improper comments

during closing argument rarely rise to the level of reversible error'." <u>Valbert v. Pass</u>, 866 F.3d 247, 241 (7th Cir. 1989).  In the case at bar, none of counsel's arguments misstated the evidence or were so inflammatory as to have misled or improperly swayed the jury.  <u>See</u> <u>e.g.</u>, <u>Wipf v. Kowalski</u>, 519 F.3d 380, 387-88 (7th Cir. 2008).  Even in the one instance where Defendant did object, this Court provided a curative instruction which more than adequately mitigated any harm from counsel's comments.  <u>See</u> <u>e.g.</u> <u>Soltys v. Costello</u>, --- F.3d ---, No. 06-3175, 2008 WL 763313 at *6-7 (7th Cir. 2008).

4.  *Woehrle's testimony*

Twenty-nine days prior to trial, Plaintiff made a supplemental disclosure regarding Woehrle's testimony.  Plaintiff supplemented Woehrle's expert testimony and added in Woehrle's opinions regarding the front tire.  In particular, Defendant emphasizes Plaintiff's closing statement when Plaintiff's counsel emphasized the evidence on the front tire.

Prior to trial, this Court was lenient towards both sides regarding late disclosures of opinion testimony.  (See Doc. 368, Order allowing Defendant's testimony, August 21, 2008.)  In this case, Plaintiff was to file all supplemental disclosures within thirty days of trial.  <u>See</u> Fed.R.Civ.P. 26(a)(3), (e).  In this case, Plaintiff filed the opinion at issue on the first business day after the thirty day deadline.  Accordingly, this Court did not consider Plaintiff's late disclosure to be in violation of the deadline.

Furthermore, this Court considered Woehrle's opinion to be a "supplemental" rather than a "new" opinion.  The difference between a "supplemental" and a "new" opinion is that a new opinion will render a previous opinion "substantially incomplete or inaccurate."  Fed.R.Civ.P. 26(e), advisory committee notes.  In this case, Weohrle's opinions regarding the front tire did not render his previous opinions "substantially incomplete or inaccurate."  Instead, his supplemental opinion fit with his general opinion that the forensic evidence from the accident showed that the cause of the accident was "cord through liner," rather than overdeflection.

Defendant further argues that they were prejudiced by the late disclosure of opinion testimony regarding the front tire.  When considering a late disclosure, our Appellate Court has laid down four guiding factors:  1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.  Defendant does not allege bad faith or that there was a likelihood of disruption of the trial.  Instead, Defendant argues that they were prejudiced because additional discovery would have allowed them to rebut Woerhle's opinion regarding the front tire.

If Plaintiff had lost at trial, Plaintiff would likely make the same complaint that they were prejudiced by Defendant's late disclosures and would have benefited from additional discovery.  However, simply speculating that more discovery would have helped is not enough.  Defendant has not informed this Court of what exactly

additional discovery could have provided.  Defendant has not put forward any theory or possible opinion which, if expanded upon in discovery, could have challenged Woerhle's opinions regarding the front tire.  This Court will not speculate that additional discovery could have made a difference when Defendant has not even suggested a theory, which, if put to discovery, could have countered Woehlre's opinion.  Furthermore, Woehrle's opinion regarding the front tire was substantially similar to the opinion of Defendant's expert, Tony Mills.  As a result, Defendant was well aware of the opinion and was not prejudiced by its late disclosure.  Finally, the fact that Plaintiff's counsel hammered home his argument regarding the front tire does not make this evidence prejudicial.  Simply because evidence is persuasive does not make the evidence prejudicial.

### 5. *Kasner's testimony*

Defendant argues that Kasner's testimony exceeded the bounds placed on his testimony by this Court's <u>Daubert</u> Order.  (Doc. 210, Order March 5, 2007.) However, Defendant does not cite any portion of the record.  Plaintiff argues that Kasner's testimony stayed well within the establish bounds.  Without any citation to the record, this Court is not about to do Defendant's work and search for any oversteps in Kasner's testimony.  <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir.1991) ( "Judges are not like pigs, hunting for truffles buried in briefs" or in the record); <u>Economy Folding Box Corp. v. Anchor Frozen Foods Corp.</u>, 515 F.3d 718 (7th Cir.2008); <u>United States v. McLee</u>, 436 F.3d 751, 760 (7th Cir.2006).

### 6. *The "day-in-the-life" video*

Defendant presented a "day-in-the-life" video which depicted Plaintiff's daily routine since the accident. Prior to trial, this Court viewed the entire video and found that it accurately reflected the day to day aspects of Plaintiff's life as described in the record. Candy Hall, Plaintiff's caretaker, was seen throughout the video and she was shown taking care of Plaintiff. Ms. Hall took the stand during trial and laid the foundation for the video. She was available for cross-examination and Defendant declined to examine her.

Our Appellate Court has ruled that a district court is within its discretion to show such a video under similar circumstances. DeBiasio v. Illinois Cent. R.R., 52 F.3d 678, 87 (7th Cir. 1995). In particular, "[t]he possibility that a film will be prejudicial is significantly reduced when the subject of that film can be cross-examined at trial." Id. (internal citations omitted) In the case at bar, the video and the voices which could be heard on the video accurately reflected the day to day aspects of Plaintiff's life after the accident and the video did not prejudice Defendant's case.

7. *Examination of Thomas Rolls*

Defendant's corporate representative, Thomas Rolls, testified about the manufacturing and inspection process. Rolls demonstrated a tire inspection on direct examination and used one of Plaintiff's exemplar tires (the "Hulver tire") for the examination. On cross examination, Plaintiff sought to impeach Rolls by showing that Rolls had missed two defects in the Hulver tire during his demonstration. Through such an impeachment, Plaintiff would have had an

opportunity to bring a second tire into dispute which allegedly survived manufacturing with defects.  Specifically, Plaintiff's counsel began this line of questioning by asking Rolls if there was a tire in the courtroom that had "not one but two defects."  Defendant objected and this Court noted that this information was already in the record.  Namely, Rolls had already admitted that tires do escape the manufacturing and inspection process with defects.  As a result, this Court sustained the objection.  Defendant then put forward a vehement curative instruction which this Court declined to give to the jury.  Instead, this Court instructed the jury that the objection was sustained as beyond the scope of direct examination and the information called for was duplicative of information already in the record.  (Doc. 412, Ex. C at 57-83.)

Defendant now argues that once Plaintiff asked the question a bell was rung with the jury that could not be unrung.  Namely, Plaintiff's question left an impression in the jury's mind that the Hulver tire was defective.

First, the bell was ringing well before counsel asked the question.  Rolls had already acknowledged that tires with defects survived manufacturing and inspection.  Plaintiff's question was improperly barred because a lengthy debate could have ensued over defects in a tire that was not relevant to the underlying case.  However, the question alone did nothing more than imply to the jury that it was possible for a tire to reach distribution with a defect.  Thus, counsel's question alone did not add anything new to the jury's impression of the case.

Secondly, the sound of the bell was given ample time to die down.  This incident occurred during the second week of trial.  The defects in the Hulver tire went unmentioned for the next week of testimony and were unmentioned in closing arguments.  Accordingly, the jury did begin deliberations until substantial time had passed during which any prejudicial impact was mitigated.

Finally, the Court's curative instruction muted any ringing of the bell.  Courts have disallowed testimony regarding similar defects or accidents because such evidence threatens to raise extraneous controversial issues, confuse the subject and could be more prejudicial than probative.  J.B. Hunt Transport, Inc. v. General Motors Corp., 243 F.3d 441, 445 (8th Cir. 2001).  In this case, this Court instruction that the evidence sought was already in the record muted these concerns.  The jury was aware of what evidence had already been presented and there was no evidence of a defect in the Hulver tire already before the jury.  Accordingly, the jury had no choice but to believe that the only possible information which could have come to light through Plaintiff's inquiry was that tires with defects could escape the manufacturing facility.  Chlopek v. Fed. Ins. Co., 499 F.3d 692, 699 (7th Cir. 2007) (courts must presume that juries follow the instructions given them.)  As a result, any prejudicial ringing was silenced before the jury began deliberations.

8. *Weight of the Evidence*

A court asked to set aside a jury's verdict must view the jury's decision with great deference and may set aside the jury's assessment of the facts only if the verdict is contrary to the manifest weight of the evidence.  See Riemer v. Illinois

Dep't of Transp., 148 F.3d 800, 806 (7th Cir.1998); Robinson v. Burlington N.R. Co., 131 F.3d 648, 656 (7th Cir.1997).  "As long as there is a reasonable basis in the record to support [the verdict]," it is not to be overturned.  Robinson v. Burlington N.R. Co., 131 F.3d at 656.

Defendant argues that the defect described by Woerhle was impossible under the circumstances proposed by Plaintiff.  Defendant points out that Woerhle testified that a tire with a "cord through liner" defect would have leaked air immediately.  Defendant now argues that Plaintiff's theory is impossible because the subject tire could not have held air for two years if the tire had a cord through liner defect.

However, Defendant has misstated Woerhle's testimony.  According to Woerhle once the cords were imbedded in the innerliner, the innerline began to leak air.  The air then leaked from the innerliner through to one of the outer layers of the tire.  (Doc. 399 at 163-165.)  Over time the air leaked out to an outer layer where it formed a bubble or blister.  The blister then burst causing the blowout and the accident.  (Doc. 399 & Doc. 400.)  Accordingly, Defendant has misstated Woerhle's opinion regarding the leak which would be caused by cord through liner.  As a result, Defendant's argument does not convince this Court that the verdict was against the manifest weight of the evidence.

9. *Michigan v. Illinois Law*

Defendant restates his previous argument that Michigan law should have applied to this case.  This Court already addressed this argument (Doc. 276, Order,

July 30, 2007) and held that Illinois law applies under the 'most significant relationship' approach.  This Court weighed a variety of factors including the fact that the accident occurred in Illinois, Plaintiff spent more miles on the bike in Illinois than in any other state, and Plaintiff consciously chose to visit Illinois.  Any limited relation which this case has to Michigan or New York was not outweighed by the strong presumption in favor of applying the law of the place of injury.  Townsend v. Sears, Roebuck and Co., 879 N.E.2d 893 (Ill. 2007).   Accordingly, this Court did not err in applying Illinois law.

### C.
### Remmittitur of Damages

Defendant believes that he is entitled to a remmittitur of damages because the jury award was a product of passion and prejudice.[1]  In order for the circumstances to so warrant a remmittitur a jury award must be "monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence."  Dresser Indus., Inc. v. Gradall co., 965 F.2d 1442 at 1446 (7th Cir. 1992).  Because damage calculations are "essentially an exercise in factfinding," a court's review of the jury's damage award is deferential.  Id.

Defendant's argument that the verdict was born of passion is perfunctory and underdeveloped.  In particular, Defendant fails to address the fact that ample evidence was provided on each of the itemized damages which Plaintiff was

---

[1] Defendant also argues that they should receive a remittitur of damages under Michigan law.  This argument was previously addressed by this Court. (Doc. 276, Order, July 30, 2007.)  In the brief at bar, Defendant has not stated any legal reason why Michigan law should be applied to the particular issue of damages.  Accordingly, this Court will not consider this argument.

ultimately awarded by the jury.  This Court must give deference to the jury's reliance upon that evidence and since the jury's finding was rationally related to evidence, the finding will not be disturbed by this Court.

## III.
## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion [Doc. 390] is DENIED.

ENTERED this  2nd   day of June, 2008.

s/ Joe B. McDade
Joe Billy McDade
United States District Judge
